STAR PUBLISHING COMPANY *v.* JACKSON.

[No. 17,301.   Filed December 20, 1944.]

James V. Donadio, George P. Ryan, Ross, McCord, Ice & Miller, all of Indianapolis, for appellant.

Russell J. Dean and Robert L. Carrico, both of Indianapolis, for appellee.

DRAPER, C. J.—This is a proceeding brought before the Industrial Board under the Indiana Workmen's Occupational Diseases Act, being Acts 1937, ch. 69, p. 334, § 40-2201, et seq., Burns' 1940 Replacement.

The board, by majority of its members, found that "the plaintiff was disabled on account of an occupational disease, namely, neurosis, which was contracted by him while in the employment of the defendant and which was brought about and caused by his employment with the defendant . . . as a linotype operator for defendant for a period of many years since the year 1929," and compensation was awarded for twenty-four weeks temporary total disability at the rate prescribed by law. The findings and award also designate the disease as an "occupational neurosis."

The defendant assigns as error that the award is contrary to law.

The evidence discloses the plaintiff working for the defendant as a linotype operator from 1929 to September 1943. About March 1943 he noticed that his left hand would cramp and draw up as he worked, preventing proper operation of the keyboard. He had no difficulty with the right hand, although its burden of work equalled that of the left.

The medical testimony indicated without dispute that plaintiff was in excellent health. No organic disease, muscle atrophy, sensory loss or impairment of reflexes

or sensibilities could be discovered. His skull, spine, vital organs, blood pressure and pulse were normal and there was no weakness of the muscles of the left upper extremity. The tendons, nerves and arteries of the upper left arm were objectively intact and normal. The appellee was exhaustively examined in many other respects, but the objective examination was entirely negative. All medical witnesses agreed that plaintiff was suffering from a neurosis, and that the condition was not peculiar to any particular occupation. In only one respect did the experts disagree. The plaintiff's physician, who had not in his examination of the plaintiff explored the possibilities of a mental difficulty, testified: "I would attribute it (such neurosis) to chronic fatigue of the nerve centers controlling the muscles of the upper left extremity, particularly those controlling the movement of the hand and digits which make the movements necessary to the operation of the linotype machine." The others attributed it solely to a condition of the appellee's mind that had arisen out of a disagreement between him and his foreman, with consequent unpleasantness existing between them for a period of ten years, the appellee feeling that the foreman had discriminated against him, had been unkind toward him, had denied him well deserved vacations and twice attempted to have him discharged. The evidence discloses that neurosis is not characteristic of the business involved, one witness testifying that in his experience extending over forty-two years, he had not heard of such a complaint among linotype operators.

Neurosis has been defined as: "A functional nervous disorder, without demonstrable physical lesion." Webster's New International Dictionary, 2nd Edition, 1942 and as: "A change in the nervous system of the individual that produces symptoms, but in which on

examination of the nerve organs, after death, at an autopsy, for instance, no physical symptoms could be found." 45 C. J. 1390.

The evidence and scientific books on the subject agree that the risk of becoming disabled as the result of a neurosis is not peculiar to any particular employment or necessarily to employment at all; that it may occur in countless occupations, gainful or otherwise, for it appears generally to be a defense reaction which may arise in connection with any kind of work, or even play, as the result of an accident or injury, a clash of personalities, a feeling of frustration, inadequacy, aversion for the occupation and the like. It is thus an ordinary disease of life to which the general public is exposed outside the employment, and therefore, not compensable in this case unless it followed as an incident of an occupational disease as defined by our statute. Acts 1937, ch. 69, § 6, p. 334, § 40-2206, Burns' 1940 Replacement.

We therefore inquire whether such is the case here, and in so doing consider only the evidence favorable to the plaintiff.

> While the Act should be construed liberally to effectuate its purposes, it should not be extended to embrace cases which cannot reasonably be interpreted as coming within its scope.

Section 6 of the Act under consideration defines occupational diseases and outlines the circumstances under which diseases shall be considered to be occupational. Under the statute, to be occupational, a disease must be one which gradually develops from, and bears a direct causal connection with the *conditions* under which the work is performed, and which results from an *exposure* occasioned by and naturally incidental to a particular employment. It

is not such as comes from a hazard to which workmen would have been equally exposed outside the employment, but must appear to have had its origin in a risk connected with the employment and to have flowed from that source as a rational consequence.

In *Kniat* v. *Industrial Commission* (1941), 378 Ill. 210, 37 N. E. (2d) 810, the Supreme Court of Illinois, in applying a statute worded almost exactly like our own, held that a chronic hernia which developed because of the repeated lifting of articles of various weights over a long period of years was an ordinary disease of life to which the public generally was exposed, and the court in its opinion said: "People in all walks of life have hernias, and the causes of them are so numerous that it cannot be said they are peculiar to any employment. Nearly everybody expends energy every day in a manner which might in time produce a weakening of the abdominal walls and result in what is described as a chronic hernia . . . ."

In our opinion the same reasoning would apply in this case. It is well known that fatigue, whether of the nerve centers, muscles or other cells or organs of the body, is in its very nature common to nearly all employments and to countless other of the ordinary activities of life. People of all ages and in all walks of life are affected by it, and the causes are so numerous that it cannot be said they are peculiar to or result from an exposure occasioned by and naturally incidental to any particular employment.

We therefore hold that chronic fatigue, if a disease at all, was not in this case shown to be an occupational disease as defined by law.

Award reversed.

NOTE.—Reported in 58 N. E. (2d) 202.